# IN THE SUPREME COURT OF IOWA

No. 16–1009

Filed April 7, 2017

**DENNIS WILLARD,**

Appellee,

vs.

**STATE OF IOWA,**

Appellant.

Appeal from the Iowa District Court for Johnson County, Mitchell E. Turner, Judge.

The State appeals from a district court ruling granting plaintiff's motion to compel discovery. **REVERSED AND REMANDED.**

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, and Forrest Guddall (until withdrawal) and Anne Updegraff, Assistant Attorneys General, for appellant.

Matt J. Reilly of Eells & Tronvold Law Offices, PLC, Cedar Rapids, for appellee.

Erika Eckley, Des Moines, and T. Randall Wright of Baird Holm LLP, Omaha, Nebraska, for amicus curiae Iowa Hospital Association.

Paul Drey, Jeanine Freeman, and Allison M. Steuterman of Brick Gentry, P.C., West Des Moines, for amici curiae American Medical Association and Iowa Medical Society.

**ZAGER, Justice.**

In this interlocutory appeal, we are asked to determine whether a hospital's Patient Safety Net materials are protected under the morbidity and mortality privilege, and whether this information is discoverable in this medical negligence action. Dennis Willard was seriously injured in a motor vehicle accident in Davenport, Iowa. After initial treatment in Davenport, Willard was transferred to the University of Iowa Hospitals and Clinics (UIHC) for further treatment. Because of the seriousness of his injuries, he was sedated and intubated. During his treatment at UIHC, Willard underwent a number of medical examinations and tests, one of which was an abdominal CT scan. Willard claims that while being transported to the CT scan and while undergoing the CT scan, UIHC was negligent in its handling of him. As a result, Willard claims he sustained an injury to his left shoulder and arm, in addition to his foot. After the CT scan, an employee of UIHC filed a PSN form about the incident. As part of his lawsuit for medical negligence against the State of Iowa,[1] Willard requested discovery of the PSN and related documents. The State objected to the disclosure of the PSN and related documents, claiming the documents were privileged. Willard filed a motion to compel. After a hearing and briefing, the district court granted the motion to compel and ordered the State to produce the documents. The State applied for an interlocutory appeal and for a stay of the district court ruling, which we granted. For the reasons expressed below, we reverse the district court ruling and conclude the PSN and related documents are privileged under the morbidity and mortality statute and are not subject to discovery.

---

[1]UIHC is owned, operated, and controlled by the State of Iowa.

## I. Background Facts and Proceedings.

Dennis Willard was involved in a head-on motor vehicle accident in the late hours of November 3, 2011. Willard sustained significant injuries from the collision and was initially treated at the Genesis Medical Center East in Davenport, Iowa. While at Genesis, Willard underwent imaging studies and x-rays. One of the x-rays covered Willard's left shoulder and showed no break or dislocation.

Willard was transferred to the UIHC early in the morning on November 4. UIHC performed more imaging studies and x-rays, and the follow-up x-ray of Willard's left shoulder again showed no break or dislocation. While at the UIHC, Willard's condition deteriorated, which required that he be sedated and intubated. Because the doctors were concerned that Willard had sustained internal organ damage as a result of the accident, he underwent an abdominal CT scan on November 6. Willard remained sedated and intubated during the CT scan. In order to perform the CT scan, the imaging technologists were required to raise Willard's arms above his head.

When Willard returned to his floor after the CT scan, staff noted that he exhibited a lack of motor response in his left arm and pain with range of motion. They requested an orthopedic team consult, and the orthopedic surgeon ordered more x-rays of Willard's left shoulder. At this point, orthopedic surgeon Dr. Buckwalter diagnosed Willard with an anterior-inferior dislocation in the left shoulder, and he relocated it. Willard's progress notes stated that orthopedics was consulted "regarding left anterior-inferior shoulder dislocation following a trip to CT for an abdominal exam." The next day, Willard's progress notes again stated that orthopedics had been consulted "after he sustained a left shoulder dislocation in an anterior inferior direction while obtaining a CT scan."

Willard filed a petition at law and jury demand on November 24, 2014, pursuant to the Iowa State Tort Claims Act.[2]  The underlying basis for Willard's claim is that he was negligently handled while sedated, causing him to sustain injuries to his left shoulder, arm, and foot.  He argues the State owed him a duty to exercise reasonable care in transporting him while sedated and the employees of the hospital breached that duty.  He asserts that the x-rays from Genesis and the x-rays taken at UIHC on November 4 do not show a left shoulder dislocation.  However, the x-ray taken after the abdominal CT scan shows a left shoulder dislocation, which indicates his shoulder was dislocated during the CT scan procedure.

During the course of discovery, Willard submitted the following interrogatories:

**INTERROGATORY No. 6:** State whether you, your agents or attorneys have obtained any statement, either oral or written, from any person having knowledge of facts relating to the subject matter of this action, and if so, please state:

(a) the name and address of each person giving such statement;

(b) whether each such statement is written or recorded and signed or unsigned;

(c) the date, time, and place each such statement was taken;

(d) the name and present address of the person taking each such statement;

(e) the name and address of each person having custody and control of such statement;

(f) the substance of each such statement.

**INTERROGATORY No. 16**: Was any document withheld under any alleged privilege?  If the answer was yes, identify

_____

[2]Iowa Code chapter 669 (2015).

> each document for which a privilege is claimed, together with the following information: date, sender, recipients, recipients of copies, subject matter of the document, and the basis upon which said privilege is claimed.

Willard also made an initial request for documents seeking copies of any reports or memoranda relating to him, the incident referenced in his petition, or the injuries or damages included in his petition. In a supplemental request for documents, Willard requested "[a]ny PSN, unusual incident report or other incident report prepared by any agent or employee of Defendant in November 2011 that relates to or refers to Plaintiff."

Willard filed the supplemental request for documents after deposing UIHC senior imaging technologist Cyndie Beaumont, who had assisted with Willard's CT scan. During her deposition, Beaumont stated that she did not recall the CT scan itself, but does remember Willard because she learned that an incident report had been filed about the scan the next day. The incident report that was filed was a Patient Safety Net (PSN) form.

A PSN is an electronic form that allows UIHC employees to enter information about events that raise a safety concern for patients. The UIHC encourages staff to enter a PSN for any safety concern, and thousands of PSNs are submitted every year. UIHC employees are informed that PSNs are confidential and protected. A submitted PSN may be used for a number of purposes, including but not limited to morbidity and mortality studies, a source for UIHC staff to review events, a source to determine trends, information to identify topics for research or conference presentations, and literary reviews.

Once a PSN is entered, it is submitted to an electronic database and reviewed by the UIHC quality department. This initial review is

conducted daily, and the department determines where to route each submitted PSN. The department may submit the PSN for review to a quality officer or the safety oversight team. The PSN may also be routed to the patient safety issues group of a specific department, such as anesthesiology.

The safety oversight team is a multidisciplinary group that reviews PSNs to identify trends and revises hospital policy based on those trends. A PSN is submitted for review to the safety oversight team if it is a "serious adverse event" or a "sentinel event." A serious adverse event is an event that requires special intervention because the potential for serious injury is high. A sentinel event is a serious adverse event that involved death or serious physical or psychological injury, or a serious adverse event that involved a high risk of death or serious physical or psychological injury. Once a PSN based on a serious adverse event or a sentinel event is submitted to the safety oversight team, the team determines whether a Root Cause Analysis (RCA) is required.

If an RCA is required, a group of content experts studies the underlying event and makes conclusions about the event and the contributing causes. The group then provides recommendations for reducing the risk of the same safety issue occurring in the future. Finally, the group prepares an action plan based on the recommendations and implements it.

The PSN system does not track how PSNs are used, so it is unknown whether Willard's specific PSN was used for morbidity and mortality studies, research, an RCA, or quality improvement.

On March 14, 2016, Willard filed a motion to compel the PSN and related pages.[3] The State acknowledged that it had in its possession twenty-four pages of materials that included the PSN and related documents, but it objected to the disclosure of the material. The State resisted Willard's motion, arguing that the documents were privileged under the morbidity and mortality privilege contained in Iowa Code sections 135.40 through 135.42. *See* Iowa Code §§ 135.40–.42 (2015). Further, the State argued the documents were not discoverable under section 135.42. The district court held an evidentiary hearing and ordered the State to produce the PSN and related documents for an in camera review.

On June 9, the district court granted Willard's motion to compel. The district court found that the State failed to meet its burden to establish the PSN was subject to the morbidity and mortality privilege contained in section 135.40. The district court found that the morbidity and mortality statute was created for situations where data is collected for a study, but that the State did not meet its burden to establish that the PSN was created or used for the course of any study for the purpose of reducing morbidity or mortality. The district court also found that section 135.41 did not apply because the case did not involve a third party. The district court found that section 135.42 dealt with the issue of admissibility, but not discoverability, of the requested documents. The district court found that because discovery rules are to be liberally construed and the information contained in the documents could

---

[3]Originally, the State acknowledged it had possession of a four-page PSN and associated eight pages. The State later discovered a second four-page PSN and related eight pages. The State's discovery response was supplemented to acknowledge that it had in its possession the twenty-four pages but objected to their disclosure.

reasonably lead to admissible evidence, the PSN was subject to discovery. The district court also found that the attorney–client and work-product privileges did not apply. The district court ordered the State to produce the PSN and related documents to the plaintiff within twenty days. It also ordered Willard not to disclose the documents to anyone except his expert witnesses. Any other proposed disclosures would need the approval of the district court.

On June 13, the State filed an application for interlocutory appeal and motion for stay of the district court ruling to produce the PSN and related documents, which we initially denied. On June 17, the State filed a motion for review of the denial. We stayed enforcement of the district court ruling pending our ruling on the motion for review. On June 24, we granted the application for interlocutory appeal and stayed further proceedings below.

## II. Standard of Review.

We review a district court's discovery decisions for an abuse of discretion. *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 139 (Iowa 2013). An abuse of discretion exists when the district court's ruling "rests upon clearly untenable or unreasonable grounds." *Id.* (quoting *Lawson v. Kurtzhals*, 792 N.W.2d 251, 258 (Iowa 2010)). "A ground or reason is untenable . . . when it is based on an erroneous application of the law." *Sioux Pharm., Inc. v. Eagle Labs., Inc.*, 865 N.W.2d 528, 535 (Iowa 2015) (quoting *Office of Citizens' Aide/Ombudsman v. Edwards*, 825 N.W.2d 8, 14 (Iowa 2012)). "To the extent we . . . engage in statutory interpretation, our review is for correction of errors at law." *DuTrac Cmty. Credit Union v. Hefel*, ___ N.W.2d ___, ___ (Iowa 2017).

### III. Analysis.

On appeal, the State argues that the morbidity and mortality confidentiality privilege applies to the PSNs at issue here pursuant to Iowa Code sections 135.40–.42.[4]  The State further argues that the PSN and related documents are not subject to discovery based on the specific language of Iowa Code section 135.42.  When a privilege is statutory, "the terms of the statute define the reach of the privilege."  *Carolan v. Hill*, 553 N.W.2d 882, 886 (Iowa 1996).  In order to determine whether the PSNs are entitled to the privilege, statutory interpretation must be employed.  "The purpose of statutory interpretation is to determine the legislature's intent."  *State v. Howse*, 875 N.W.2d 684, 691 (Iowa 2016) (quoting *Schaefer v. Putnam*, 841 N.W.2d 68, 75 (Iowa 2013)).

**A. Background.**  In 2000, the Institute of Medicine (IOM) published a report entitled *To Err Is Human: Building a Safer Health System*, which analyzed common medical errors and how to prevent them.  Inst. of Med., *To Err Is Human: Building a Safer Health System* (Linda T. Kohn, Janet M. Corrigan, & Molla S. Donaldson eds., 2000) [hereinafter *To Err Is Human*]; *see also Tibbs v. Bunnell*, 448 S.W.3d 796, 800 (Ky. 2014).  The report estimated between 44,000 and 98,000[5] people die annually in hospitals as a result of preventable medical errors. *To Err Is Human*, at 26.  The majority of these preventable errors "were not the result of personal recklessness but rather resulted from faulty systems, processes, and conditions."  *Lee Med., Inc. v. Beecher*, 312

---

[4]Neither Willard nor the district court dispute that the statute creates a privilege.

[5]At the time the report was published, this would have made preventable hospital deaths one of the leading causes of death in the United States, with even the lower number surpassing deaths due to motor vehicle accidents, breast cancer, or AIDS.  *To Err Is Human*, at 26–27.

S.W.3d 515, 534 (Tenn. 2010). The report recommended that hospitals adopt a four-tiered system to make the health system safer for patients. *To Err Is Human*, at 6. The identified four tiers are (1) enhancing knowledge of patient safety, (2) identifying medical errors through both mandatory and voluntary reporting systems, (3) raising performance standards and expectations for improvement, and (4) adopting safety systems to ensure patient safety practices. *Id.*

Following the publication of the report, Congress enacted the Patient Safety and Quality Improvement Act of 2005 (PSQIA), Pub. L. No. 109-41, 119 Stat. 424 (codified at 42 U.S.C. 299b-21 to 299b-26 (2012)). "The Patient Safety Act 'announces a more general approval of the medical peer review process and more sweeping evidentiary protections for materials used therein.' " *Dep't of Fin. & Prof'l Regulation v. Walgreen Co.*, 970 N.E.2d 552, 557 (Ill. App. Ct. 2012) (quoting *KD ex rel. Dieffenbach v. United States*, 715 F. Supp. 2d 587, 595 (D. Del. 2010)). The purpose of the PSQIA was "to encourage the reporting and analysis of medical errors and health care systems by providing peer review protection of information reported to patient safety organizations for the purposes of quality improvement and patient safety." *Tibbs*, 448 S.W.3d at 801 (quoting H.R. Rep. No. 109–197 (2005)). The protections included in the Act were intended to apply to documents or communications that constitute "patient safety work product." *Id.*

The Iowa Legislature originally enacted morbidity and mortality study statutes in 1963 and amended the statutes in 2006, after the publication of the IOM report and the enactment of the PSQIA. *Compare* Iowa Code §§ 135.40–.42 (1966)*, with id.* §§ 135.40–.42 (2006). These provisions provide,

## 135.40. Collection and distribution of information.

Any person, hospital, sanatorium, nursing or rest home, or other organization may provide information, interviews, reports, statements, memoranda, or other data relating to the condition and treatment of any person to the department, the Iowa medical society or any of its allied medical societies, the Iowa osteopathic medical association, any in-hospital staff committee, or the Iowa healthcare collaborative, to be used in the course of any study for the purpose of reducing morbidity or mortality, and no liability of any kind or character for damages or other relief shall arise or be enforced against any person or organization that has acted reasonably and in good faith, by reason of having provided such information or material, or by reason of having released or published the findings and conclusions of such groups to advance medical research and medical education, or by reason of having released or published generally a summary of such studies.

. . . .

## 135.41. Publication.

The department, the Iowa medical society or any of its allied medical societies, the Iowa osteopathic medical association, any in-hospital staff committee, or the Iowa healthcare collaborative shall use or publish said material only for the purpose of advancing medical research or medical education in the interest of reducing morbidity or mortality, except that a summary of such studies may be released by any such group for general publication. In all events the identity of any person whose condition or treatment has been studied shall be confidential and shall not be revealed under any circumstances. A violation of this section shall constitute a simple misdemeanor.

## 135.42. Unlawful use.

All information, interviews, reports, statements, memoranda, or other data furnished in accordance with this division and any findings or conclusions resulting from such studies shall not be used or offered or received in evidence in any legal proceedings of any kind or character, but nothing contained herein shall be construed as affecting the admissibility as evidence of the primary medical or hospital records pertaining to the patient or of any other writing, record or reproduction thereof not contemplated by this division.

*Id.* §§ 135.40–.42 (2015).

**B.  Iowa Code Section 135.40.**  The first issue we must address is whether the PSN qualifies as a morbidity and mortality study under Iowa Code section 135.40.  The statute provides that an organization "may provide information, interviews, reports, statements, memoranda, or other data relating to the condition and treatment of any person . . . to be used in the course of any study for the purpose of reducing morbidity or mortality."  *Id.* § 135.40.  The State argues the statute is broad enough to encompass the PSN documents.  Willard argues that there is no evidence in the record that the PSN was actually used in the course of any study for the purpose of reducing morbidity and mortality, and therefore it is not protected under the statute.

When we interpret a statute, we apply well-settled principles of statutory interpretation:

> The purpose of statutory interpretation is to determine the legislature's intent.  We give words their ordinary and common meaning by considering the context within which they are used, absent a statutory definition or an established meaning in the law.  We also consider the legislative history of a statute, including prior enactments, when ascertaining legislative intent.  When we interpret a statute, we assess the statute in its entirety, not just isolated words or phrases.  We may not extend, enlarge, or otherwise change the meaning of a statute under the guise of construction.

*DuTrac*, ___ N.W.2d at ___ (quoting *Howse*, 875 N.W.2d at 691).  We construe a statute "liberally with a view to promoting its objects and assisting the parties in obtaining justice."  *Star Equip., Ltd. v. State*, 843 N.W.2d 446, 455 (Iowa 2014) (quoting *Lennox Indus., Inc. v. City of Davenport*, 320 N.W.2d 575, 578 (Iowa 1982)).

Morbidity and mortality are not defined by statute.  Morbidity can be defined as "a diseased state or symptom," "the incidence of disease **:** the rate of sickness," or as a collection of statistics on an illness.  *Morbidity, Webster's Third New International Dictionary* (unabr. ed. 2002).

Mortality can have a number of meanings, including "the death of large numbers : a heavy loss of life (as by war or disease)," either the whole sum of deaths or a proportion of deaths per population, or a "rate of loss or failure in a field of human endeavor." *Mortality, Webster's Third New International Dictionary.* Taken together with their common meanings, a morbidity and mortality study can be interpreted broadly to mean a collection of statistics or a study regarding the rates of illnesses, diseases, or death among a patient population.

Further, the morbidity and mortality statute has an expansive scope, which is demonstrated throughout the text of section 135.40. *See* Iowa Code § 135.40. The statute relies on a broad range of organizations to provide information—"[*a*]*ny* person, hospital, sanatorium, nursing or rest home, or other organization." *Id.* § 135.40 (emphasis added). It allows these groups to provide a wide array of information—"information, interviews, reports, statements, memoranda, or other data relating to the condition and treatment of *any* person." *Id.* (emphasis added). It allows a wide number of organizations to be the recipient of this information— "the [public health] department, the Iowa medical society or any of its allied medical societies, the Iowa osteopathic medical association, *or any in-hospital staff committee*, or the Iowa healthcare collaborative." *Id.* (emphasis added). It allows the information provided and collected "to be used in the course of *any* study for the purpose of reducing morbidity and mortality." *Id.* (emphasis added).

Hospitals are required to have ongoing, hospital-wide quality improvement programs in place that allow them to assess clinical patient care and nonclinical and patient-related services within the hospital, and to develop remedial action if necessary. Iowa Admin. Code § 481—51.3. Hospitals are required to have a written quality improvement plan which,

among other things, may address the "accessibility and confidentiality of materials relating to, generated by, or [included as] part of the quality improvement process." *Id.* § 481—51.3(4)(*g*). All of this indicates a legislative intent to encourage a wide number of individuals and organizations to report incidents and concerns about patient care, in a wide variety of formats.

A PSN clearly falls within the legislative intent of "any study for the purpose of reducing morbidity or mortality." Iowa Code § 135.40. The PSN system allows the UIHC to keep track of patient incidents and to route them to the appropriate department for resolution. The PSN system can also result in revised policies for the hospital as a whole or for use in studies, reports, and presentations. Similar to the purposes of the PSQIA, the purpose of section 135.40 is "to encourage the reporting and analysis of medical errors and health care systems by providing peer review protection of information reported to patient safety organizations for the purposes of quality improvement and patient safety." *Tibbs*, 448 S.W.3d at 801 (quoting H.R. Rep. No. 109–197 (2005)). We find that the PSN and related documents are afforded a privilege as morbidity and mortality information to be used in a study as defined in Iowa Code section 135.40.

**C. Iowa Code Section 135.41.** The second issue we must address is whether Iowa Code section 135.41 has any applicability to the privilege asserted here. The district court found that the State failed to establish a privilege under this section because the case does not involve a third party being asked to produce records, but rather Willard himself requesting the documents. The district court found that the privilege only protects against disclosures to third parties.

Iowa Code section 135.41 governs the publication of studies that include material regarding morbidity and mortality. *Id.* § 135.41. The language of the statute is limiting. It limits the use of morbidity and mortality information with mandatory language. *Id.* The organizations authorized to use the information "*shall* use or publish said material only for the purpose of advancing medical research or medical education in the interest of reducing morbidity or mortality." *Id.* (emphasis added). The statute also includes a permissive clause; however, this language is still limiting. The organizations that publish material in the interest of reducing morbidity or mortality *may* release a summary of the study for general publication. *Id.* We found in *Burton v. University of Iowa Hosps. & Clinics* that the hospital has the discretion to determine whether to produce these summaries. 566 N.W.2d 182, 187–88 (Iowa 1997).

The statute does not make a distinction between a third party request for information and Willard's request for information, and we decline to read such a distinction into the statute. Furthermore, Willard is not requesting a summary of any morbidity and mortality study, but the PSNs themselves. We find that the release of the PSN is not required by section 135.41.

**D. Iowa Code Section 135.42.** The final question we must answer is whether the PSN is subject to discovery under section 135.42. The statute provides that information obtained under the morbidity and mortality statutes "shall not be used or offered or received in evidence in any legal proceedings." Iowa Code § 135.42. The State argues this should be interpreted to mean morbidity and mortality information cannot be used in any legal proceedings, including discovery. Because "shall not be . . . offered or received in evidence" already covers information utilized during trial, the State argues that any other

definition would render the words "shall not be used" superfluous, and therefore it should be interpreted to included discovery. Willard argues that while the statute provides that the documents may not be used, offered, or received in evidence, it does not preclude the documents from being discoverable.

The district court has wide discretion in rulings on discovery. *Carolan,* 553 N.W.2d at 886. We construe discovery rules liberally in order to assist in the disclosure of all relevant and material information. *Id.* However, Iowa Rule of Civil Procedure 1.503 limits the scope of discovery to "any matter, *not privileged,* which is relevant to the subject matter involved in the pending action." Iowa R. Civ. P. 1.503 (emphasis added). A party may resist discovery by demonstrating that the material sought is privileged, but the party resisting has the burden of demonstrating both that the privilege exists and that it applies. *Carolan,* 553 N.W.2d at 886. We construe asserted privileges narrowly because a privilege is an exception to our generally liberal rules regarding discovery. *Id.* When a party asserts a privilege that is based on a statute, the words of the statute define the reach of the privilege. *Id.* Here, the State has demonstrated that the materials are privileged as morbidity and mortality information under Iowa Code section 135.40. Because the privilege is statutory, the words of section 135.42 define the reach of the privilege. *Id.*

Under the doctrine of last preceding antecedent, a qualifying word or phrase only refers to the immediately preceding antecedent unless the language of the statute clearly demonstrates a contrary legislative intent. *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Shell Oil Co.,* 606 N.W.2d 376, 380 (Iowa 2000). "[E]vidence that a qualifying phrase is supposed to apply to all antecedents instead of only

to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma." *State v. Gen. Elec. Credit Corp. of Del.*, 448 N.W.2d 335, 345 (Iowa 1989) (quoting 2A Sutherland, *Statutes and Statutory Construction* § 47.33 (4th ed. 1984)).

Under this doctrine, the phrase "in evidence" only applies to the word "received" because it is the only word immediately preceding the phrase "in evidence" and there are no commas separating the words "used," "offered," and "received" in the statute. Iowa Code § 135.42. In applying the doctrine to the statute, we find the legislature has precluded the use of morbidity and mortality information under three circumstances. The studies or information may not be: (1) used in any legal proceeding, (2) offered in any legal proceeding, or (3) received in evidence in any legal proceeding. *See id.*

Additionally, when a statute is ambiguous, we may consider the "consequences of a particular construction" in determining the legislature's intent. *Id.* § 4.6(5). Here, there are relevant public policy issues to be considered. The rationale underlying the protection of privileged communication from discovery "is the protection of interests and relationships, which rightly or wrongly, are regarded as of sufficient social importance to justify some sacrifice of availability of evidence relevant to the administration of justice." 8 Tom Riley & Peter C. Riley, *Iowa Practice Series*™*, Civil Litigation Handbook*, § 29:1 (2016 ed.) (quoting *McCormick on Evidence* § 72 (4th ed.)).

The overall statutory scheme regarding morbidity and mortality information and studies is broad. As discussed earlier, section 135.40 encompasses a wide number of individuals and organizations that may provide information and a wide number of organizations that may receive information. Iowa Code § 135.40. It provides that information used in

the course of *any* study intended to reduce morbidity and mortality rates is subject to its protection. *Id.* Section 135.41 is similarly broad in its protection of information related to morbidity and mortality. *Id.* § 135.41. Only a summary of the studies may be released, but within the discretion of the organization producing the study. *Id.*; *Burton*, 566 N.W.2d at 187–88.

We likewise find that the legislature intended section 135.42 to broadly cover "*any* legal proceeding." Iowa Code § 135.42 (emphasis added). There are a number of public policy objectives underlying morbidity and mortality statutes. Preventable medical errors are a pervasive issue in hospitals across the country and decreasing the number of these errors is of the utmost importance. *To Err Is Human*, at 26–27. The information utilized in morbidity and mortality studies is collected from hospital employees and is intended to track adverse events; sentinel events; safety issues; and any other concerns regarding the health, care, and safety of patients. The objective of collecting this information is to study adverse incidents in order to create new systems and methods to prevent patient safety issues in the future. The information provided is supplied by employees about their peers or supervisors. Morbidity and mortality studies are protected so employees are forthcoming with their concerns, issues, and criticisms.

We considered similar public policy considerations in *Carolan*. 553 N.W.2d at 886. Although *Carolan* dealt with the confidentiality of peer review records, *see* 553 N.W.2d at 886, we nevertheless find the rationale similarly persuasive in the context of PSNs and related documents. We noted that confidentiality was imperative because

> [p]eer review privileges encourage an effective review of medical care. If such records were privileged only when directed at a specific licensee, hospitals would have difficulty

conducting reviews of their health care departments. Without the broad protections, physicians would be very reluctant to participate, knowing the information could easily be revealed in a court of law.

*Id.* at 886–87.

The same is true for PSNs and the related documents. There is a strong public policy argument for interpreting section 135.42 broadly. The protection afforded by the confidentiality privilege allows hospital staff to feel comfortable reporting any and all safety concerns because those reports will remain confidential and not be subject to discovery in a legal proceeding. This confidentiality allows hospitals to utilize PSNs to reduce adverse patient safety events based on preventable medical errors. The protection is intended to apply to documents or communications that constitute "patient safety work product." We find that Iowa Code section 135.42 extends to prevent discovery of PSNs and related documents.

### IV. Conclusion.

For the above reasons, we reverse the decision of the district court. We find that the PSN and related documents are the type of information covered by the morbidity and mortality statute and are therefore privileged under Iowa Code section 135.40. We find that Iowa Code section 135.41 does not apply because Willard does not seek a summary of the morbidity or mortality study but rather the PSN and related documents themselves. Finally, we find that based upon the language contained in section 135.42, the PSN and related documents are not subject to discovery.

**REVERSED AND REMANDED.**